525 F.Supp. 101 (1981)
UNITED STATES of America
v.
J. D., R. S., and J. S., Defendants.
No. 81 Cr. 0008 (RWS).
United States District Court, S. D. New York.
September 4, 1981.
As Amended October 13, 1981.
John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City; for the United States of America; Ruth Glushein, Benito Romano, Asst. U. S. Attys., New York City, of counsel.
Caesar D. Cirigliano, Federal Defender Services Unit, The Legal Aid Society, New York City, for defendant R. S.; Jack Lipson, Brooklyn, N. Y., of counsel.
Theodore Kreiger, New York City, for defendant J. D.
Louis Aidala, New York City, for defendant J. S.
SWEET, District Judge.
The three defendants in the above-captioned action are alleged to have attempted the robbery of a branch of the Manufacturer's Hanover Trust Company in the Bronx in January, 1981. At the time of the alleged offense, all three defendants were under the age of eighteen, and were therefore "juveniles" within the meaning of that term as used in the federal Juvenile Delinquency statute, 18 U.S.C. § 5031, et seq. The government has moved to transfer these defendants to adult status pursuant to 18 U.S.C. § 5032. In opposition to the government's motion, attorneys for two of the defendants press constitutional challenges to the transfer statute. A hearing was held on the motion on August 3 and August 6, 1981. After the hearing, and while the motion was under consideration, additional information of relevance to this motion was brought to the attention of the court by letter of the Assistant United States Attorney assigned to this case. After consideration of all of the evidence before me and of the legal arguments made, I have decided, for the reasons set forth below, that the interests of justice would best be served by reserving decision on all three motions to transfer. Although the question is not free from difficulty, I have concluded that 18 U.S.C. § 5032 is constitutional.
18 U.S.C. § 5032 outlines the prerequisites for the exercise of federal jurisdiction over juvenile defendants and the procedure for transfer of juveniles to adult status. As a prerequisite to the exercise of federal jurisdiction *102 over juveniles, it requires the government to certify that:
the juvenile court or other appropriate court of a State (1) does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, or (2) does not have available programs and services adequate for the needs of juveniles.
In the absence of such certification, the juvenile is to be surrendered to state authorities. Id.
If the federal court exercises jurisdiction, the juvenile is to be proceeded against as a juvenile unless he requests to be treated as an adult or:
with respect to a juvenile sixteen years and older alleged to have committed an act after his sixteenth birthday which if committed by an adult would be a felony punishable by a maximum penalty of ten years imprisonment or more, life imprisonment, or death, criminal prosecution on the basis of the alleged act may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, such transfer would be in the interest of justice.
Id. The statute provides that the following factors are to be considered by the court in determining whether the transfer would be "in the interest of justice":
The age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems.
Id. Finally, the statute mandates that notice of the transfer hearing be given to "the juvenile, his parents, guardian, or custodian and to his counsel" and provides for the juvenile to be assisted by counsel "during the transfer hearing, and at every other critical stage of the proceedings." Id.
The United States Attorney filed a certification with the court that a juvenile or other appropriate court of the State of New York does not have jurisdiction over these defendants with respect to this matter. This case is therefore within the jurisdiction of this court. 18 U.S.C. § 5032. See United States v. Vancier, 515 F.2d 1378, 1379 (2d Cir. 1975), cert. denied, 423 U.S. 857, 96 S.Ct. 107, 46 L.Ed.2d 82 (1975) ("Attorney General's certification must be accepted by the district court as final.")
I will begin by addressing the constitutional challenge to this statute. Attorneys for defendants R.S. and J.S. argue that the statute is unconstitutionally vague in its recitation of factors to be considered by the court in ruling on the transfer motion. Specifically, they argue that the statute provides no guidance as to the manner in which the court is to view and utilize proof of the defendants' "present intellectual development and psychological maturity."[1] They pose a clever and difficult question: if the court finds that a defendant is mature and intellectually developed, should it then conclude that he is a promising candidate for rehabilitation within the juvenile justice system, and so deny the transfer motion? Or should it conclude that, being mature and developed, he is likely to be set in his ways, unlikely to be receptive to treatment, and deserving of being held fully accountable for his own actions; and should the court therefore grant the motion to transfer? Conversely, if the defendant is found to be immature and intellectually feeble or undeveloped, should he be treated as a juvenile because there may be a chance of positive development through treatment or *103 should he be treated as an adult because his immaturity and lack of intellectual development render the prospects for improvement bleak? The statute, these attorneys argue, supplies no answer to these questions, and so invites arbitrary and erratic interpretation and application.
Attorneys for R.S. and J.S. couple this due process challenge with an attack based on the defendants' Sixth Amendment right to counsel. Not knowing which way these factors cut, they say they cannot effectively represent their clients because they do not know what facts they should seek to establish and what allegations they should attempt to refute. In accordance with this position, both declined to cross-examine the government's witnesses at the hearings mentioned above.
Although it is true, as counsel contend, that the statute does not expressly state which way a court is to view psychological maturity and intellectual development in deciding a transfer motion, some guidance is provided by the statute's premises, purpose, provisions and legislative history and by judicial application of this and other juvenile statutes.
The purpose of the statute is to channel juvenile offenders out of the adult criminal justice system and to provide for their treatment and rehabilitation. See United States v. Frasquillo-Zomosa, 626 F.2d 99, 101 (9th Cir.), cert. denied, 449 U.S. 987, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980); United States v. Hill, 538 F.2d 1072, 1074 (4th Cir. 1976); S. Rep. No. 93-1011, 93d Cong., 2d Sess. 3, reprinted in [1974] U.S. Code Cong. & Ad.News 5283, 5286. It therefore seems to evince a commitment to what has been called the "rehabilitative ideal," which underlay the creation of the juvenile justice system, and which has as its premise "a societal consensus that youthful law violators should be treated differently from adult offenders because juveniles are both less responsible for their delicts and more responsive to nonpunitive intervention." Feld, Reference of Juvenile Offenders For Adult Prosecution: The Legislative Alternative to Asking Unanswerable Questions, 62 Minn.L.Rev. 515, 516 (1978) (footnote omitted). This ideal is thus based on two distinct but related concepts, both rooted in a determinist view of young people. The first is that they are essentially products of their environments and so not yet responsible for their own acts. The second is that since they are as yet unformed, positive intervention may succeed in making them useful members of society. See generally id.
The federal juvenile statute was the result not only of a commitment to the rehabilitative ideal, however, but also of congressional concern about the serious problem posed by juvenile crime. That concern is reflected in the statute's legislative history. See S.Rep.No. 93-1011, supra, at 5285.
Interpretation of the Act, and of the meaning of the "interest of justice" standard to be applied in a transfer proceeding, should be informed both by an awareness of the goal of rehabilitation and the premises underlying the rehabilitative ideal and by an awareness of the congressional concern about the threat to society posed by juvenile crime. The factors set forth in 18 U.S.C. § 5032 for consideration in deciding where justice lies in ruling on a transfer motion can best be understood through reference to these two, sometimes competing, concerns.
One federal court, cognizant of these dual concerns, determined that immaturity is a factor weighing against transfer. See United States v. E. K., 471 F.Supp. 924, 936 (D.Ore.1979). That interpretation is in keeping with the rehabilitative model reflected in the federal statute, which assumes that young people, still undeveloped, can be directed in socially useful paths. Immaturity means that one is not yet set in his ways, not yet fully formed; the court in U. S. v. E. K. recognized this and that there is therefore a purpose to be served in retaining the immature defendant in the juvenile system where treatment may lead to positive development.
This reading of the "psychological maturity and intellectual development" factor is also consistent with the other notion underlying *104 juvenile statutes, that is, that the immature, being essentially the products of their environments, may not justly be held responsible for their delicts and are thus deserving of non-criminal treatment. See generally United States v. Hill, 538 F.2d at 1074 (discussing non-criminal nature of federal juvenile statute).
Furthermore, in my view, this interpretation of this clause of the statute is not only in keeping with the rehabilitative ideal the law embraces, but is also the common sense reading of a statute that categorizes offenders according to age, mandating special treatment for the very young while allowing adult treatment of those closer to the age of majority. That statutory scheme would seem to reflect a determination that the more mature and developed are more likely to be beyond redemption and more deserving of being held accountable for their acts.
Therefore, although the federal statute does not instruct the court which way to apply these factors, I conclude that it is in keeping with the statutory premise, goal and design to view immaturity and lack of development as factors weighing against transfer to adult status and maturity and development as factors weighing in favor of transfer. This reading of the federal statute is consistent with state court interpretations of state juvenile laws. See Matter of Kent, 31 Or.App. 1219, 572 P.2d 1059 (1977); State v. Gibbs, 94 Idaho 908, 500 P.2d 209, 217 (1972). In light of this determination, I conclude, furthermore, that the statute is not void for vagueness.
It should be borne in mind that psychological maturity and intellectual development are not the only factors to be considered on a transfer motion. There is room in the consideration of the other factors enumerated in the statute for appropriate weight to be given to evidence that indicates that a particular defendant may pose a serious threat to society. For example, even an immature and undeveloped defendant may appropriately be transferred to adult status if his prior delinquency record, the nature of the present offense, or a history of poor responsiveness to treatment efforts suggests that the public will be imperilled if he is not given strong criminal sanctions, including imprisonment beyond the age of twenty-one. Through consideration and weighing of all of the factors set forth in § 5032, both congressional concernsfor rehabilitation and for safeguarding the public  may be accommodated.
As mentioned above, at the hearing on this transfer motion, attorneys for defendants R.S. and J.S. declined to cross-examine the government's witnesses on the basis of a Sixth Amendment claim rooted in the vagueness claim just discussed. In these circumstances, I deem it appropriate to reserve decision on the motions to transfer R.S. and J.S., and to provide counsel with a second opportunity to present evidence and to cross-examine the government's witnesses. A further hearing will be held on September 11, 1981 at 10:00 a. m.
Turning to the motion to transfer defendant J.D., the evidence before me includes testimony by an agent of the Federal Bureau of Investigation ("F.B.I."), testimony by J.D. himself at the hearing on the motion, an affidavit by the Assistant United States Attorney who initially had responsibility for this litigation, a written report and testimony by the psychiatrist who examined J.D. pursuant to court order, a report by a neurologist who also examined J.D. pursuant to court order, a report compiled by a United States Probation Officer assigned to investigate J.D.'s background, and testimony by that same probation officer concerning the availability of juvenile treatment facilities. In addition to that evidence, I have before me the letter from the Assistant United States Attorney mentioned above. After considering all of this material, I have decided that the interests of justice would best be served by reserving decision on the government's motion to transfer J.D. as well, but for different reasons from those just given for reserving decision on the motions pertaining to R.S. and J.S. What follows constitutes my findings with regard to each of the factors enumerated in 18 U.S.C. § 5032, discussion *105 of the factors which lead me to reserve decision and findings under the Speedy Trial Act.
1. Age. J.D. was born on April 6, 1963. The offenses charged in the juvenile information are alleged to have occurred on January 2, 1981. J.D. was thus roughly seventeen years and eight months old at the time of the events in question here.
2. Social background. J.D. was the third of his mother's six children. His mother has never married, and his father does not live in her household, but his father has nonetheless shown an interest in J.D. through the years. J.D. resides in his mother's home, along with several of his siblings. His mother is employed as a family assistant. His father reportedly works as a maintenance man. Except for a period in 1980 when J.D. was enrolled in a Job Corps program in Texas, it appears from the record before me that he has resided in the Bronx for his entire life. His family's financial resources are limited and will not permit any treatment other than that which is provided by public authorities.[2]
3. The nature of the alleged offense. The attempted bank robbery with which J.D. is charged is alleged to have occurred on the morning of January 2, 1981. The events of that morning were described by the investigating F.B.I. agent at the hearing on the transfer motion as follows. For the purposes of this motion only, I will accept the agent's account.
On the morning of January 2, five black males got into a car on Woodycrest Avenue in the South Bronx. They drove around for a time, then made a stop in front of a Chase Manhattan Bank on Westchester Avenue. One of the occupants of the car got out, walked near the bank, then returned to the car. The group continued on to a second Chase Manhattan Bank on East Gunhill Road, passed by it several times, then parked on an adjacent street. J.D., one of those in the car, got out, walked to the bank, peered into it through the window and then through the front doors, then returned to the car.
The group once again drove on, stopping next near Boston Road in the vicinity of three banks, one of which is the branch of the Manufacturers Hanover Trust which these defendants are alleged to have attempted to rob. Four of the five occupants of the car got out and walked toward the Manufacturers Hanover Trust building. When they got to a point approximately ten feet from the bank, law enforcement officers who were there waiting for them announced their presence and identity and ordered the members of the group not to move.
Two of the individuals, one Richard Brown and the defendant J.S. who is before me, surrendered immediately. J.S. possessed a 20-gauge shotgun with a sawed-off barrel. Brown possessed a .38 caliber Smith & Wesson revolver.
*106 Two members of the group, J.D. and R.S., fled and were apprehended after a chase. J.D. was not armed. R.S. had a .38 caliber revolver, which he threw to the street while fleeing.
All of the weapons carried by the defendants were loaded.
4. The extent and nature of J.D.'s prior delinquency record. J.D. has no known juvenile record. The probation officer's report indicates that in April of this year he was arrested for possession of a controlled substance, but that the charge was adjourned in contemplation of dismissal in May.
5. Present intellectual development and psychological maturity. The written report and testimony by the psychiatrist who examined J.D. indicate that he is a young man of less than average intelligence and limited capacity for abstract and logical thought. That assessment is consistent with his school records as reported by the probation officer. The probation officer's report indicates that J.D. was discharged from public high school in the Bronx on January 5, 1981 as overage. His high school grades were apparently all failing. Achievement tests administered to J.D. in the tenth grade revealed that he was then reading at the sixth grade level, with mathematical skills below the fourth grade level. J.D. is reported to have an I.Q. of 82.
Based on the written reports of the probation officer and the psychiatrist, and on the psychiatrist's testimony, I find that J.D.'s intellectual development is quite limited.
His psychological "maturity" is somewhat more difficult to assess. The psychiatrist described J.D. as "an emotionally isolated and an intellectually impoverished man whose social and psychological adjustment has been compromised." The doctor characterized J.D. as a depressed young man with low self esteem, who could benefit from a treatment program combining vocational training and psychotherapy.
My conclusion from this psychological description and from my own observations of J.D. on the witness stand is that J.D. is not yet developed, that his development has been impeded, and that he is therefore psychologically immature.
6. The nature of past treatment efforts and J.D.'s response to such efforts. As mentioned above, J.D. was enrolled in a Job Corps training program in Texas after leaving high school. He did well there, and was described as a "team worker who respects property and others." However, J.D.'s participation in the program was cut short because of a fight which arose after a racist remark was directed at him. Rather than face disciplinary proceedings, J.D. left the program.
7. The availability of programs designed to treat the juvenile's behavioral problems. At the hearing on the transfer motion, a probation officer who had investigated the availability of programs for juveniles in the federal system testified that juveniles cannot be handled within the federal prison system, but are boarded in state facilities. She further testified that there are no such facilities in the State of New York that would be available for juveniles in the age range of the defendants in this case. However, there are such facilities in Kentucky and Connecticut.
The above are my findings on the factors enumerated in the statute. In addition to those factors, I have considered certain aspects of the testimony of J.D. himself that do not fit neatly into the statutory classifications. J.D. came across as a fairly slowwitted and unsophisticated young man with a limited understanding of the world around him. He also, however, manifested a certain eagerness to take care of himself and to achieve what he can. He has secured part-time employment in a hospital during the pendency of these proceedings, and gives some of what he earns to his mother. He testified that, depending on the outcome of this case, he has plans to enroll in a vocational program in September.
Despite the promise of certain of the facts just found, after the hearing on this motion, the Assistant United States Attorney *107 informed the court by letter that J.D., R.S. and J.S. have been named in an elevencount indictment filed on August 24, 1981. That indictment alleges that the defendants participated in a series of bank robberies while on bail in this case. The defendant J.D. is named in five counts of armed bank robbery. Each of those robberies is alleged to have occurred after his eighteenth birthday, and, therefore, will, if proven, be adult offenses. J.D. is now in custody.
In light of these recent charges, I deem it appropriate and in the interest of justice to reserve decision on the motion to transfer J.D. It would be unrealistic to ignore this new indictment, and unfair and improper to consider it as the charges it contains are unproven. J.D. will not be prejudiced by a further delay in this case for this purpose, nor will the government be prejudiced or the public interest jeopardized. On the other hand, the disposition of the pending charges could well be highly relevant to a just determination of the transfer motion. Therefore, I find under 18 U.S.C. § 3161(h)(8)(A) that the ends of justice served by the granting of a continuance outweigh the best interests of the public and the defendant in a speedy trial and the decision on the government's motion to transfer J.D. is reserved pending disposition of the charges against him in Indictment 81 Cr. 590.
The information in this case was filed on January 8, 1981. The government's motion to commit the defendants to the custody of the Attorney General for observation and study on an out-patient basis and to transfer them to adult status was filed on January 23, 1981; to accommodate the schedules of counsel, that motion was heard on February 20, 1981. On April 13, 1981, an initial opinion on that motion was filed, ordering the defendants to submit to psychiatric examinations in connection with the transfer motion. Those examinations and other background research on these defendants for use in connection with this motion were then undertaken. As mentioned above, a hearing was held on the motion during the first week of August, 1981. The motion has been under advisement since that time, and, as set forth above, decision on all three defendants will be reserved pending further proceedings on this motion for defendants R.S. and J.S. and further proceedings under Indictment 81 Cr. 590 for defendant J.D. In view of the ongoing series of events just outlined, I find that the time from the filing of this motion until today is excludable under the Speedy Trial Act, 18 U.S.C. § 3161(h)(1)(F). That provision will continue to apply to toll the running of the speedy trial time for defendants R.S. and J.S. until the additional hearing is held and a decision is rendered. As outlined above, the period from today until the disposition of the charges lodged against him in Indictment 81 Cr. 590 will be excluded as to defendant J.D. under 18 U.S.C. § 3161(h)(8)(A).
This opinion is to be sealed.
IT IS SO ORDERED.

APPENDIX
On consent of all attorneys, this opinion is being submitted for publication with the defendants' names withheld.
NOTES
[1] The vagueness doctrine is most often invoked in situations in which the concern of the litigant is lack of fair notice of what a statute prohibits. However, the Supreme Court has recognized that vagueness challenges may properly be mounted against statutes that fail to provide adequate guidance for their administration, and therefore create a potential for arbitrary and discriminatory court action. See Giacco v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966).
[2] I interpret the term "social background" in the broadest sense. I take it to encompass the defendant's family background, his community ties, his connections with any institutions, and any other aspects of his role in and relationship to society. Economic class is a part of this, no doubt, but I do not consider it the most significant or even a particularly useful factor to consider. This is especially so in view of studies that suggest that economic class alone is not a good predictor or index of anti-social behavior, and that indeed "[the] factors normally associated with `official delinquency'  poverty, low educational attainment, minority group membership  may in fact be correlates of the official response to the offender rather than causal explanations of the behavior itself." Feld, Reference of Juvenile Offenders, supra, at 531-32. [Footnote omitted.] "For instance, although juvenile offenders appear to come disporportionately from the lower social classes and minority groups, middle and upper class youths may engage in hidden delinquencies with virtually the same frequency and degree of seriousness as youths from the lower classes." Id. [Footnote omitted.] In light of those studies, and the equal protection questions they suggest, the whole area of "social background" in this context appears particularly troublesome. I therefore consider it appropriate to construe the term as broadly as possible, to include all elements of a defendant's social interaction, rather than only those aspects such as economic class that are generally thought to be associated with criminal activity.