UNITED STATES of America,
Plaintiff,

v.

C.P.A. (a juvenile), Defendant.

No. 4:07–cr–097.

United States District Court,
D. North Dakota,
Northwestern Division.

May 29, 2008.

---

**ORDER GRANTING MOTION TO
TRANSFER (SEALED)**

DANIEL L. HOVLAND, Chief District
Judge.

The juvenile information charges the defendant, C.P.A, with one count of second degree murder, which allegedly occurred on or about November 4, 2007.[1]  *See* Dock-

---

1. Pursuant to 18 U.S.C. § 5038(e), the court uses the juvenile's initials to identify her throughout this order. "Unless a juvenile who is taken into custody is prosecuted as an

adult neither the name nor the picture of any juvenile shall be made public in connection with a juvenile delinquency proceeding."  18 U.S.C. § 5038(e).

et No. 1. On November 20, 2007, the government filed a motion and accompanying memorandum in support of a transfer to adult court pursuant to 18 U.S.C. § 5032, in accordance with the Federal Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. §§ 5031–5042. *See* Docket No. 15.

An evidentiary hearing on the government's motion to transfer was held on May 6, 2008, in Bismarck, North Dakota. The hearing was closed to the public.[2] Assistant United States Attorney David Hagler represented the government. The government presented the testimony of Jon Gustin, Bureau of Prisons; Helen Keplin, Helen Parisien, and Patty Allery. Assistant Federal Public Defender Orell Schmitz represented C.P.A. The defendant presented the testimony of Dr. Peter C. Peterson. On May 16, 2008, the parties each filed post-hearing memorandums. *See* Docket No's. 42–43.

After a careful consideration of the voluminous record, the evidence presented at the transfer hearing, and the post-hearing submissions of the parties, the Court concludes that the interests of justice warrant transferring the juvenile defendant, C.P.A., to adult court for prosecution.

## I. *LEGAL DISCUSSION*

### A. *WHETHER THE OFFENSE IS TRANSFERABLE UNDER 18 U.S.C. § 5032*

■ Initially, the Court must determine whether the charged crime is the type of crime for which a juvenile may be prosecuted as an adult. The statute provides in pertinent part:

> [W]ith respect to a juvenile fifteen years old and older alleged to have committed an act after his fifteenth birthday which

*if committed by an adult would be a felony that is a crime of violence . . .,* criminal prosecution on the basis of the alleged act may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, such transfer would be in the interest of justice.

18 U.S.C. § 5032 (emphasis added). The defendant is charged with one count of second degree murder in violation of 18 U.S.C. §§ 1111, 1153, and 2. The term "crime of violence" means "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16(a). The Court finds that the charge of second degree murder clearly meets this test and is considered a "crime of violence." Further, it is alleged that the defendant was seventeen years and eight months old when she committed the alleged crime. Therefore, the offense is transferable under 18 U.S.C. § 5032.

### B. *BURDEN OF PROOF AND EVIDENTIARY RULES*

■ "The purpose of a transfer hearing is to ascertain whether a juvenile should be tried as an adult for the alleged crime." *United States v. Parker*, 956 F.2d 169, 171 (8th Cir.1992). The government bears the burden to prove by a preponderance of the evidence that a transfer is warranted. *Id.* "A transfer hearing is not a criminal proceeding which results in an adjudication of guilt or innocence, but a civil proceeding which results only in an adjudication of status." *Id.* Juvenile transfer proceedings "are analogous to preliminary examinations in criminal cases, and thus . . . the Federal Rules of Evidence (including the hearsay rule) do not apply

---

**2.** A hearing to determine whether to transfer a juvenile to adult status is generally closed to the public, including the victims and their

families. *See United States v. L.M.*, 425 F.Supp.2d 948 (N.D.Iowa 2006).

except with respect to privileges." *United States v. S.L.W.*, 406 F.3d 991, 995 (8th Cir.2005) (citations omitted).

A juvenile can be transferred for adult criminal prosecution upon her request or upon the government's motion and the court's finding that the interests of justice require it. *United States v. Juvenile Male,* 923 F.2d 614, 615–16 (8th Cir. 1991). In determining whether a transfer would be in the "interests of justice," the Eighth Circuit has held that a district court must consider six statutory factors: (1) the age and social background of the juvenile; (2) the nature of the alleged offense; (3) the extent and nature of the juvenile's prior delinquency record; (4) the juvenile's present intellectual development and psychological maturity; (5) the nature of past treatment efforts and the juvenile's response to such efforts; and (6) the availability of programs designed to treat the juvenile's behavioral problems. *United States v. A.D.J.*, 108 F.3d 851, 852 (8th Cir.1997).

For the purpose of a transfer hearing, the court may assume the juvenile committed the alleged offense. *United States v. Juvenile LWO,* 160 F.3d 1179, 1181 n. 1 (8th Cir.1998). The government bears the burden of rebutting the statutory presumption of juvenile treatment. *United States v. Nelson,* 68 F.3d 583, 588 (2d Cir.1995); *United States v. T.F.F.,* 55 F.3d 1118, 1121 (6th Cir.1995); *United States v. A.R.,* 38 F.3d 699, 703 (3d Cir. 1994). Because a transfer hearing is a civil proceeding which determines status, and not a criminal proceeding which determines guilt or innocence, the government need only persuade the court by a preponderance of the evidence. *United States v. Parker,* 956 F.2d 169, 171 (8th Cir.1992). Accordingly, a motion to transfer is properly granted when a court determines that the risk of harm to the public from treating violent individuals more leniently out-weighs the likelihood that the juvenile will be rehabilitated before she reaches majority. *United States v. SLW,* 406 F.3d 991, 993 (8th Cir.2005).

The decision of whether to transfer a juvenile to trial as an adult under 18 U.S.C. § 5032 is within the sound discretion of the trial court. *United States v. Juvenile JG,* 139 F.3d 584, 586 (8th Cir.1998). In analyzing the requisite six factors, the court is not required to give equal weight to each factor, but rather may balance the factors as it deems appropriate. *United States v. Juvenile Male MC,* 322 F.3d 482, 485 (8th Cir.2002).

### 1. AGE AND SOCIAL BACK-GROUND

The first of the six statutory factors to be considered is the age and social background of the juvenile. Courts focus on the age of the juvenile at the time of the alleged offense. *United States v. A.D.J.,* 108 F.3d 851, 852 (8th Cir.1997). Courts may also give weight to the juvenile's age at the time of the transfer hearing because current age is an important consideration in determining whether juvenile rehabilitation programs would be appropriate for the individual who is subject to the transfer proceeding. *Nelson,* 68 F.3d at 589. The closer a defendant is to the age of eighteen, the stronger the presumption that she should be treated as an adult. *See United States v. Smith,* 178 F.3d 22, 27 (1st Cir.1999) (stating "the proximity of a juvenile's age to age eighteen is another important factor for the court's consideration"); *United States v. T.F.F.,* 55 F.3d 1118, 1121 (6th Cir.1995) (affirming a district court's reasoning that "because defendant was eighteen at the time of the transfer hearing, there was little time left to rehabilitate defendant within the juvenile system").

██ C.P.A. was born on March 3, 1990, and was seventeen years and eight months old at the time of the charged offense on November 4, 2007. The defendant was eighteen (18) years old at the time of the transfer hearing on May 6, 2008. The fact that C.P.A. was more than 17½ years old at the time the criminal offense occurred, and that she is currently eighteen years old, favors her transfer to adult status. *See United States v. Smith,* 178 F.3d 22, 27 (1st Cir.1999); *United States v. Juvenile No. 1,* 118 F.3d 298, 308 (5th Cir.1997); *United States v. Dion L.,* 19 F.Supp.2d 1224, 1225 (D.N.M.1998) (juvenile crime committed two months before 18th birthday favored transfer to adult status.)

With respect to the social background of the defendant, C.P.A. lives with her mother, Carrie Thibert. It appears that C.P.A. has had little contact with her father who lives in the Belcourt area. It is undisputed that Carrie Thibert has been committed for drug and alcohol treatment on more than twenty occasions. C.P.A. and her three siblings have been removed from Thibert's care and custody by tribal court officials on numerous occasions. C.P.A. has been in substance abuse treatment at least seven or eight times since she was fourteen years old. She has a well-documented and extensive drug/alcohol history. C.P.A. went through treatment at a facility in Williston, North Dakota, from June 28, 2007 to September 19, 2007. Thereafter, Carrie Thibert petitioned the Tribal Court to commit C.P.A. to a juvenile treatment facility in South Dakota, because she was once again using street drugs. C.P.A. completed her most recent treatment at the Aberdeen Youth Regional Treatment Center in Aberdeen, South Dakota, on October 30, 2007. She then returned home to live with her mother (Carrie Thibert) on October 31, 2007. Shortly after she returned home, C.P.A. left the residence within days and also left her two-year-old child in the care of Thibert. C.P.A. was not seen again until after her arrest for the alleged murder offense on November 4, 2007. The investigation indicates that C.P.A. attended a party at a residence where drugs and alcohol were present and the alleged offense occurred at the residence.

C.P.A.'s work history is scant. It appears that she has held one full-time job, working at DynaBand as a telemarketer from February 2007 to July 2007. The record is replete with evidence that C.P.A. associates with unsavory characters. At the time of the alleged murder, she was with Justin Beston, a convicted felon. In 1999, Beston pled guilty to burglary in this Court, with robbery and assault charges dropped in exchange for a guilty plea. *United States v. Beston, et al.,* C4–99–015. Beston also has state convictions for burglary in 2003 and fleeing in 2004. *State v. Beston,* 40–1–K–405; *State v. Beston,* 40–4–K–150.

C.P.A. is the mother of a two-year-old child whose father is Amos Norquay. C.P.A. became pregnant when she was just fourteen years old. Norquay was thirty (30) years old at the time. Norquay is currently in federal prison for sexual abuse of a minor. *United States v. Norquay,* No. 4:06–cr–53. Norquay has other prior felony convictions. He pled guilty to misprision of a felony which was related to a violent murder on the reservation. *United States v. Counts, et al,* C4–00–66.

The Court finds that C.P.A.'s troubled social background supports a transfer to adult status. The record clearly establishes that she comes from an extremely dysfunctional and unstable family. Every witness who testified at the transfer hearing agreed that C.P.A's chaotic home environment is a significant contributing factor to her troubled background. Everyone also agrees that a return to her community and the chaos of her home environment is

a recipe for failure. C.P.A. has had no significant contact with her father, and her mother has serious and extensive substance abuse issues. C.P.A. finished her seventh chemical dependency treatment in August 2007 and was committed for further drug treatment less than one month later. Within days of being released from a juvenile drug treatment facility in Aberdeen, South Dakota, C.P.A. returned to the Belcourt area and again began associating with convicted felons, drug users, and consuming alcohol and using street drugs. The likelihood of successful rehabilitation as a juvenile under the circumstances is slim. Such circumstances weigh in favor of a transfer of the juvenile to adult court. *See Juvenile No. 1,* 118 F.3d at 308 (the absence of a strong family environment would make rehabilitation prospects for the juvenile unlikely).

## 2. *THE NATURE OF ALLEGED OFFENSE*

The second factor the Court must consider is the nature of the alleged offense. Courts have given considerable weight, and at times predominant weight, to an offense of a serious nature. *See United States v. A.R.,* 203 F.3d 955, 963–64 (6th Cir.2000). The Eighth Circuit has recognized that when a crime is particularly serious, the district court is justified in weighing this factor more heavily than others. *U.S. v. Juvenile Male MC,* 322 F.3d 482, 485 (8th Cir.2002).

As previously noted, for purposes of the transfer hearing, the court may assume that the juvenile committed the alleged offense. The alleged offense is murder in the second degree which involved the brutal beating and death of an intoxicated woman. An offense of such a heinous nature should weigh in favor of transfer to adult status. *United States v. Juvenile JG,* 139 F.3d 584, 586–587 (8th Cir.1998); *United States v. Dion L.,* 19 F.Supp.2d 1224 (D.N.M.1998).

The affidavit of Special Agent Wayne Thomas of the Bureau of Indian Affairs was submitted in support of an application for an arrest warrant. *See* Docket No. 2. That affidavit reveals in relevant part the following:

1. On Sunday, November 04, 2007, a party was held at the residence of Danielle Baker aka Danielle Banks, aka Danielle Dickey (hereinafter Baker). Baker lived at Apartment 808, East Dunseith Housing, Dunseith, North Dakota, on tribal land of the Turtle Mountain Indian Reservation. The party began during the later afternoon/early evening. Attendees at the party were drinking, visiting, and listening to music.

2. Approximately ten to twelve individuals are believed to have been in attendance at the party, including Chelsey P. Amyotte, a 17 year old female and Justin Beston, a 27 year old male. Amyotte and Beston are in an on-again, off-again relationship. Baker was also interested in Beston, and witnesses reported that this situation has caused some friction between the three in the past. Witnesses described seeing Beston wearing a white short sleeve shirt with red stripes.

. . .

5. Law enforcement officers found Baker deceased on her bed in the bedroom. Individuals at the scene were detained and eventually interviewed. Amyotte and Beston were not present when law enforcement arrived. Witnesses provided information that identified Amyotte and Beston as potential suspects in Baker's death. Amyotte and Beston were seen leaving the scene with Shannon Vallie in a maroon Chevro-

let Trailblazer. Vallie was driving, Amyotte was riding in the front passenger seat, and Beston was riding in the backseat. Amyotte and Vallie were located at the Sky Dancer Casino, near Belcourt, North Dakota, approximately two hours later. Beston was located several hours later at his uncle's home in East Dunseith Housing.

6. On 11/06/2007, an autopsy was conducted of Danielle Baker's body. The North Dakota State Medical Examiner's office offered a preliminary opinion that Baker had died when her brain stem was severed. The injury was most likely sustained as a result of being beaten in the head and face.

. . .

15. On 11/04/2007, Chelsey Amyotte was interviewed by Federal Bureau of Investigation (FBI) Special Agent (SA) Ryan P. O'Neil and Bureau of Indian Affairs SA Wayne Thomas. Amyotte's mother participated in the interview. Amyotte had a purple bruise on her left jaw at the time of the interview. Amyotte admitted striking Baker 3–7 times after they had gotten into an argument over Beston. The fight occurred in Baker's bedroom, and when Amyotte left, Baker was alive lying on the bed. Beston then went into the bedroom and began to argue with Baker. Amyotte stood outside the room, heard a "smack," and then did not hear anything else from the room. Amyotte and Beston then contacted Vallie, who came to the residence and picked them up.

16. On 11/07/2007, Chelsey Amyotte was interviewed again by FBI SA O'Neil and BIA SA Thomas. Amyotte's mother was present during the interview as well. Amyotte eventually admitted that she and Beston assaulted Baker in her bedroom. They followed her into her bedroom after she and Baker had gotten into an argument in the hallway. Beston slapped Baker with an open hand approximately eight times. Amyotte then got onto the bed and struck Baker in the mouth with a closed fist two to three times. Beston then got on top of Baker in a mounted position and struck her in the face eight to ten times with a closed fist. Amyotte tried to pull Beston off of Baker, but Beston struck Amyotte in the jaw. She stated that the purple bruise on her jaw was a result of being struck by Beston. A short time later Vallie arrived, and Amyotte and Beston left with Vallie. They discussed making money in order to get out of town. Beston offered to try to find them a car, and Vallie gave Beston her cell phone so that they could stay in touch with him when he got out of the car.

. . .

18. On 11/07/2007, Theresa Amyotte was interviewed over the telephone by BIA SA Thomas. Theresa is the wife of Dennis Amyotte, who is Chelsea Amyotte's father. Theresa said that on the evening of November 4, 2007, Chelsey called her father's residence. Theresa was present and answered the telephone. Chelsey asked to speak to her father. Theresa was sitting next to Dennis on a couch and could hear what Chelsey was saying to her father. Theresa heard Chelsey ask for money and say "I beat up a woman in Dunseith and

she was not breathing. Dad, I really hurt her and I am really scared."

This was a serious, violent, and senseless assault that resulted in the death of Danielle Baker. The autopsy report concluded that Baker's brain stem was severed as a result of being beaten in the head and face. The Court gives considerable weight to this factor and finds that this was a brutal murder which weighs strongly in favor of a transfer to adult status.

### 3. *PRIOR DELINQUENCY RECORD*

The next factor the Court needs to examine in determining whether a transfer to adult court is warranted is the defendant's prior delinquency record. The Eighth Circuit has determined that "the plain language of the term 'the juvenile's prior delinquency record' cannot plausibly be interpreted to encompass evidence of unrecorded acts, nor can it be plausibly interpreted to encompass evidence of conduct which has not been adjudicated or admitted to be delinquent or criminal." *United States v. Juvenile LWO,* 160 F.3d at 1183. As a result, the Eighth Circuit has concluded that "the plain language of the term 'the juvenile's prior delinquency record' would not encompass evidence of incidents or behavior, which could be of a delinquent or criminal nature, for which there has been no charge or a charge but no conviction." *Id.; United States v. SLW,* 406 F.3d 991, 993 (8th Cir.2005). In regard to this factor, the Court will only consider charges that were brought against the defendant that resulted in a conviction.

The Court has carefully reviewed C.P.A.'s juvenile records. Her prior delinquency record is neither extensive nor serious in nature. The defendant has a few instances of delinquency in her tribal court records which include charges and convictions of theft, aggravated reckless driving, and fleeing. The Court finds that the defendant's limited record of juvenile criminal proceedings does not weigh in favor of a transfer to adult court. The insignificant juvenile record stands in contrast to other cases where the courts have transferred juveniles to adult status. *See United States v. Gerald N.,* 900 F.2d 189, 191 (9th Cir.1990) (finding that the juvenile had "an extensive six-year history of delinquency"); *United States v. Jerry Paul C.,* 929 F.Supp. 1406, 1409–1410 (D.N.M.1996) (noting that at the time of the charged offense the juvenile had already compiled a serious juvenile record which included firearms violations, assault and battery, and multiple burglaries); *In re T.W.,* 652 F.Supp. 1440, 1443–44 (E.D.Wis.1987) (recognizing that the juvenile's record included drug violations, stealing bicycle parts, truancy violations, assaultive behavior, curfew violations, and an extensive history of problems at school which included striking a teacher); *United States v. Means,* 575 F.Supp. 1068, 1070 (D.S.D. 1983) (determining that the defendant's numerous problems progressively became more serious as he got older, including offenses such as burglary, driving under the influence, disorderly conduct, curfew violations, and driving a stolen car). The Court finds that defendant's limited juvenile record does not weigh in favor of a transfer.

### 4. *INTELLECTUAL DEVELOPMENT AND PSYCHOLOGICAL MATURITY*

The Court must next consider the defendant's intellectual development and psychological maturity. A "Mental Health Evaluation" was conducted by Dr. Sara Kenney at the Lake Region Law Enforcement Center in Devils Lake, North Dakota, in December 2007. This was a court-ordered evaluation. The evaluation in-

cludes results from current intelligence tests or psychological examinations which included a clinical interview, the Wechsler Adult Intelligence Scale—3rd Ed (WAIS-3), the Minnesota Multiphasic Personality Inventory—2 (MMPI-2), and a Sixteen Personality Factor Questionnaire—Fifth Edition. The tests reveal that C.P.A. is of "low average" intelligence with a performance IQ of 84. The undersigned has also reviewed C.P.A.'s educational records. C.P.A. has an eighth grade education and has been in ninth grade the past four years due in part to her legal problems. The Court views the defendant as having below average intelligence. A consideration of this factor does not reveal the existence of any specific condition which would deter the defendant's potential for rehabilitation.

With respect to the defendant's psychological maturity, several district courts have observed that more mature and developed juveniles are "more likely to be beyond redemption" and that it is consistent with the Act's purpose "to view immaturity and lack of development as factors weighing against transfer to adult status and maturity and development as factors weighing in favor of transfer." *United States v. M.L.*, 811 F.Supp. 491, 496 (C.D.Cal.1992) (quoting *United States v. J.D.*, 525 F.Supp. 101, 104 (S.D.N.Y.1981)). *See also United States v. Doe*, 710 F.Supp. 958, 961 (S.D.N.Y.1989) (determining that a juvenile's immaturity suggested that transfer was improper).

Dr. Peter C. Peterson testified at the transfer hearing. Dr. Peterson is a clinical psychologist at Medcenter One in Bismarck, North Dakota. Dr. Peterson reviewed all of the records and prepared a written report based upon his evaluation of the defendant. That written report was issued on April 30, 2008. *See* Defendant's Exhibit No. 12. Dr. Peterson's findings revealed that C.P.A. is an immature young woman who was raised in a very depraved environment. C.P.A. has been neglected, exploited, and suffers from major depression that has been largely untreated to date. Dr. Peterson acknowledged that C.P.A. has undergone numerous drug treatments that have been unsuccessful, and he testified that C.P.A. is addicted to methamphetamine. C.P.A. was characterized as a young woman of average intelligence who is very dependent and impulsive.

The Court views the defendant as possessing below average intelligence, and finds that the defendant's intelligence and her level of psychological maturity are not significant obstacles to her rehabilitation. However, C.P.A. is "streetwise" and appears to show little remorse for her actions. This lack of remorse shows a level of psychological maturity that may not be conducive to rehabilitation. *United States v. G.T.W.*, 992 F.2d 198, 199 (8th Cir.1993). Unfortunately, the defendant seemingly has little desire to change her anti-social, negative behavior and seek rehabilitation. In considering these factors, the Court finds that the defendant's intellectual development and psychological maturity may weigh slightly in favor of transfer but, to a large extent, are relatively neutral considerations.

### 5. PAST TREATMENT EFFORTS AND RESPONSE

The fifth statutory factor to be considered is past treatment efforts and their success or lack of effectiveness. The Court has reviewed more than 1700 pages of medical/treatment records dating back to 2002. *See* Docket No. 44 (a CD). The defendant has been committed for drug treatment on at least seven or eight separate occasions. C.P.A. began smoking marijuana at age ten; using alcohol at age eleven; and became an IV user of methamphetamine at age thirteen. She used

methamphetamine up until the eighth month of her pregnancy in 2006. None of the exhaustive treatment efforts undertaken to date have been successful.

The alleged murder took place at a party that C.P.A. was attending in the Dunseith, North Dakota, area around November 4, 2007, that involved drugs and alcohol. C.P.A. attended this party just a few days after her discharge from a juvenile treatment facility in Aberdeen, South Dakota. She had been discharged on October 30, 2007. Shortly before her placement at the juvenile treatment facility in South Dakota, C.P.A. had participated in a drug treatment program in Williston, North Dakota, which was also a failure. Such failures of prior treatment efforts as a juvenile weigh in favor of a transfer to adult status. *United States v. Juvenile MLA,* 157 F.3d 616, 617 (8th Cir.1998).

The following is a summary of the drug/alcohol treatment programs that C.P.A. has participated in to date:

- March 29, 2004–November 30, 2004    Lake Region Human Service Center, Devils Lake, ND
- June 23–29, 2004    North Dakota State Hospital, Jamestown, ND
- June 30, 2004–August 6, 2004    Volunteers of America, Sioux Falls, SD
- July 13–28, 2005    Prairie St. John's, Fargo, ND
- October 26, 2005–April 24, 2006    Indian Health Services—Quentin Burdick Memorial Health Care Facility, Belcourt, ND
- May 1, 2006–June 21, 2007    Trinity—St. Joseph's (Trinity Addiction Services Chemical Dependence Unit), Minot, ND
- June 28, 2007–September 19, 2007    Family Recovery Home—Quantum Lachoer Center for Change, Williston, ND
- September 17, 2007–October 30, 2007    Aberdeen Youth Regional Treatment Center, Aberdeen, SD

C.P.A. is now eighteen years old. The medical/treatment records clearly reveal that she is treatment savvy and largely resistant to any significant change of her lifestyle. Dr. Peterson was questioned at the transfer hearing as to whether C.P.A. is amenable to treatment. He responded by stating that it is a "possibility" that C.P.A. is amenable, but that she needs long-term residential care and treatment.

In Dr. Peterson's report, it was noted that C.P.A. "would require very long-term, inpatient addiction treatment followed by extended residential, monitored treatment." *See* Defendant's Exhibit No. 12, pp. 5–6. Dr. Peterson opined that C.P.A. "would be unlikely to function adequately as an independent adult." *Id.* at p. 6. In his report, Dr. Peterson further noted that the "prognosis is extremely guarded." *Id.* Dr. Peterson said that C.P.A. would be amenable to treatment only if she receives long-term, inpatient treatment (12–18 months) and long-term, follow-up residential placement (12–24 months). He further opined that C.P.A. is likely to fail if she is returned to her home and community environment. *Id.*

The Court finds that this factor weighs in favor of transfer as the likelihood of C.P.A.'s rehabilitation as a juvenile is low. C.P.A.'s life on the reservation in the Dun-

seith–Belcourt area is plagued with dysfunction, chaos, drugs, alcohol, and involvement with a circle of "friends" who have chosen to live a similar dysfunctional and anti-social lifestyle. The Court finds that the totality of the circumstances as related to this factor weigh in favor of a transfer of the juvenile to federal district court to be tried as an adult. The defendant has not been amenable to treatment in any juvenile facility in North Dakota or South Dakota to date despite spending most of her teenage years in treatment.

### 6. *AVAILABILITY OF PROGRAMS FOR TREATMENT*

██ The final factor the Court must consider is the availability of programs for treatment. The government bears the burden to show that there is a lack of available programs designed to treat the defendant's problems. *United States v. Nelson,* 68 F.3d at 591.

Jon Gustin from the Bureau of Prisons (BOP) testified at the transfer hearing on May 6, 2008. Gustin is the community corrections manager for the BOP and oversees all federal facilities in North Dakota, Minnesota, and South Dakota.

Gustin said that based on the records he reviewed, C.P.A. would be placed in a "secure" facility for juveniles. There are currently only three "secure" facilities for female juveniles in the country. Those facilities are located in Devils Lake, North Dakota; Rapid City, South Dakota; and St. Anthony, Idaho. Gustin testified that it is unlikely that C.P.A. would be placed or accepted in the juvenile facilities located in Idaho or South Dakota.

With respect to the availability of programming, Gustin said the Bureau of Prisons' Residential Drug Abuse Program (RDAP), is a 500–hour drug treatment program which is considered to be the BOP's best treatment program. However, RDAP is not available in any of the juvenile facilities operated by the BOP throughout the country.

Gustin said that any defendant placed in a juvenile facility would only remain there until age 21. After turning 21 years of age, all defendants are transferred to adult facilities. Gustin said that the only reasonable placement of C.P.A. at present would be in a "secure" juvenile facility located in Devils Lake and that placement would only be until age 21.

There is some evidence of juvenile treatment programs available to C.P.A. Neither the Act nor case law requires that the Court identify a specific program that will accept C.P.A. There is no dispute that C.P.A. requires extensive drug and alcohol treatment. The Court finds that the limited availability of a "secure" juvenile facility causes this factor to weigh only slightly in favor of juvenile treatment for C.P.A. *See United States v. Alexander,* 695 F.2d 398, 401 (9th Cir.1982) (acknowledging that the availability of programs to treat a sixteen-year-old defendant weighed in favor of not transferring). However, C.P.A. is now eighteen (18) years old. The record clearly reveals that she has not been amenable to treatment in any juvenile facility in North Dakota or South Dakota. The fact that there may be some glimmer of hope for treatment and rehabilitation for this young offender in a juvenile facility must be weighed against the need to protect society from violent and dangerous individuals who have demonstrated little desire to change. Further, it is undisputed that when C.P.A. turns twenty-one years of age, she would be transferred to an adult facility if she remained in the care and custody of the Bureau of Prisons. In summary, a consideration of this factor neither weighs in favor of or against transfer.

## II. *CONCLUSION*

The Court has reviewed more than two thousand pages of C.P.A.'s educational, juvenile, medical, and drug treatment records. *See* Docket No. 44 (a CD). The Court has carefully reviewed the entire record, conducted a transfer hearing on May 6, 2008, and considered the arguments of counsel as set forth in their post-hearing briefs. The Court concludes, after careful consideration and a balancing of all six statutory factors, that the "interests of justice" warrant a transfer of the juvenile defendant to federal district court for prosecution as an adult.

The Court finds that C.P.A.'s age at the time of the alleged offense (17½) and her age at the time of the transfer hearing (18), weigh strongly in favor of transfer. C.P.A.'s intellectual development is a neutral consideration. However, C.P.A.'s psychological maturity, her numerous drug treatment sessions which have been unsuccessful to date, and the serious nature of the alleged offense, all collectively weigh in favor of a transfer to adult court. The availability of programs for treatment is largely a neutral consideration. The fact that, if incarcerated, C.P.A. would need to be transferred to an adult facility when she turns twenty-one weighs slightly in favor of a transfer.

The alleged offense of second degree murder was extremely violent and troubling. The victim's brain stem was severed as a result of the brutal and senseless assault that was committed. The affidavit of BIA Special Agent Thomas reveals that both C.P.A. and Justin Beston have admitted to striking the decedent multiple times in her bedroom the evening of November 4, 2007. *See* Docket No. 2. Justin Beston and C.P.A. then allegedly attempted to flee the area but decided to first try and "earn some money" to get out of town. The undersigned believes that the violent and heinous nature of the fatal assault warrants considerable weight, and this factor weighs strongly in favor of transfer. Balancing all of the factors together, the Court, in its discretion, finds that the six statutory factors and the "interests of justice" weigh in favor of transfer.

Finally, the Court finds that C.P.A. has repeatedly demonstrated that she is an extremely poor prospect for rehabilitation as a juvenile based upon her lack of success in a number of juvenile treatment programs she took part in throughout North Dakota and South Dakota. The drug treatment sessions began in 2004, and ended just days before the murder occurred in November 2007. For the reasons set forth above, the Court grants the government's motion to transfer the juvenile defendant to federal district court to be tried as an adult.[3]

**IT IS ORDERED**

(1) The government's "Motion For Transfer of Proceedings Against Juvenile to Adult Criminal Prosecution" (Docket No. 15) is **GRANTED;**

(2) The second degree murder charge as set forth in the Information shall be transferred to district court for the prosecution of C.P.A. as an adult;

(3) C.P.A. is notified of her right to appeal this order on an interlocutory basis. Orders transferring juveniles for adult prosecution are immediately appealable under the collateral order exception to the final judgment rule. *United States v. A.D.J.,* 108 F.3d 851, 852 (8th Cir.1997) (citing *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)); and

(4) The time between the filing of the government's "Motion for Transfer of

---

**3.** As a result of the decision to transfer C.P.A. to adult status, all future hearings will be open to the public. *See United States v. L.M.,* 425 F.Supp.2d 948, 957 (N.D.Iowa 2006).

Proceedings Against Juvenile to Adult Criminal Prosecution" (Docket No. 15) on November 20, 2007, and the date of this Order is excluded from calculation under 18 U.S.C. § 5036, the Act's speedy trial provision. The Court finds that this time period should be excluded "in the interest of justice in the particular case." 18 U.S.C. § 5036; *see United States v. David A.*, 436 F.3d 1201, 1207 (10th Cir.2006) (holding delay attributable to the filing and disposition of the government's motion to transfer tolled the 30–day period under the speedy trial provision and remarking that "[e]very circuit that has addressed the issue has reached the same conclusion") (citing *United States v. A.R.*, 203 F.3d 955, 964 (6th Cir.2000); *United States v. Sealed Juvenile 1*, 192 F.3d 488, 490–491 (5th Cir.1999); *United States v. Wong*, 40 F.3d 1347, 1371 (2nd Cir.1994) and *United States v. Romulus*, 949 F.2d 713, 716 (4th Cir.1991)).

**IT IS SO ORDERED.**