Joseph F. Bianco, District Judge
On July 10, 2017, the government filed a Juvenile Information against defendant Juvenile Female ("the defendant"),[1] charging *416 her with one count of racketeering by engaging in conspiracy to murder and murder, 18 U.S.C. § 1962(c) ; one count of racketeering conspiracy, 18 U.S.C. § 1962(d) ; one count of conspiracy to murder rival gang members, 18 U.S.C. § 1959(a)(5) ; and four counts of murder, 18 U.S.C. §§ 2, 1959(a)(1). These charges relate to the alleged murders of Justin Llivicura, Michael Lopez, Jorge Tigre, and Jefferson Villalobos in a wooded area near Central Islip Recreational Center in Central Islip, New York on April 11, 2017 ("the April 11 murders").
The government subsequently filed a Superseding Juvenile Information, which charges the defendant with the counts contained in the initial Juvenile Information and includes conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k) as an additional racketeering act. That charge arises from the defendant's alleged attempts to destroy evidence relating to the April 11 murders and to otherwise impede the investigation.
Before the Court is the government's motion under 18 U.S.C. § 5032 to transfer the case to district court in order to prosecute the defendant as an adult. On May 18, 2018, after receiving written submissions from the parties, the Court held a hearing on the motion. This Memorandum and Order contains the Court's findings under 18 U.S.C. § 5032.
As discussed in great detail below, after carefully analyzing the required statutory factors, the Court concludes in its discretion that, notwithstanding the statutory presumption in favor of juvenile adjudication, the government in this case has rebutted that presumption and met its burden of proving by a preponderance of the evidence that the defendant's transfer to adult status is warranted.
In particular, the nature of the alleged offenses overwhelmingly favors, in the interest of justice, transferring the case to district court to try the defendant as an adult. As detailed below, the defendant is charged with actively participating in four brutal murders for La Mara Salvatrucha, a violent street gang also known as the MS-13. More specifically, the defendant is alleged to have engaged in the following conduct with respect to the April 11 murders: (1) instigating the murders, along with another juvenile female, by locating photographs of some of the victims flashing MS-13 gang signs on social media (which was viewed as disrespectful because the victims were not members of the MS-13), and then showing those photographs to MS-13 members; (2) participating in meetings to plan the murders; and (3) knowingly luring the unsuspecting victims to a prearranged location in the Central Islip woods where they were murdered with machetes, knives, and tree limbs. Moreover, in the aftermath of the murders, the defendant allegedly tried to destroy evidence and impede the related investigation, including by warning the MS-13 members involved in the murders about the investigation and urging them to flee. A defendant who is alleged to have participated in this manner in the brutal murder of four individuals is unlikely to be rehabilitated within the juvenile justice system, especially given the limited sentencing options available in that system if the defendant were found guilty (such as the statutory maximum of five years' incarceration). In short, in the Court's view, given the gravity of the alleged crimes here, this is *417 the most critical factor in this particular analysis and is a compelling factor in favor of transfer.
The defendant's age and social background also strongly favor transfer. The defendant was just eight months shy of eighteen when she participated in the April 11 murders, and is now over eighteen years old. As for the defendant's social background, she lacks any stable family or social support structure and continued to demonstrate her allegiance to the MS-13 even after the brutal murders, including by allegedly helping gang members obstruct justice. Moreover, a recorded jail call by the defendant with an incarcerated MS-13 member the day after the murder, during which she allegedly discusses the murder, displays an individual, with no remorse, who appears to have fully embraced her role in the murders and is also deeply loyal to the gang. In fact, even while incarcerated at Essex County Juvenile Detention Center in connection with these charges, the defendant has been actively communicating with an alleged MS-13 member with whom she wishes to continue a relationship. Thus, although the defendant's grades in her current educational program and her behavior during her detention have reportedly been exemplary, the Court finds that her age and lack of a support structure, in conjunction with her deep loyalty to the MS-13 gang, strongly favor transferring her to adult status.
The defendant's lack of a juvenile record weighs against transfer, but as explained below, the Court finds that, in the instant case, after balancing all the statutory factors (including this one), transfer is in the interest of justice.
As for the defendant's present intellectual development and psychological maturity, the Court finds that that factor is neutral. A psychological examination of the defendant revealed that, despite strong cognitive and intellectual skills, the defendant has significant delays in developmental maturity. Thus, on balance, this factor neither favors nor disfavors transfer.
The remaining two factors-the nature of past treatment efforts and the defendant's response to those efforts, as well as the availability of programs designed to treat the defendant's behavioral problems-weigh against transfer. There is no evidence that, before her detention in connection with this case, the defendant received any formal treatment or counseling. As noted, however, the defendant's grades and behavior during her detention over the last eleven months have been commendable. Accordingly, the Court concludes that this factor weighs slightly against transfer. As for the availability of programs designed to treat the defendant's behavioral problems, there is some indication that facilities in Pennsylvania and Maine would be available to the defendant if found guilty as a juvenile. Accordingly, that factor also weighs against transfer.
Although some factors weigh against transfer, they do not outweigh the other factors that, in combination, overwhelmingly favor transfer. In particular, the violent and brutal nature of the alleged murders, including the defendant's alleged active participation in the murders and alleged obstruction of justice following the murders, in conjunction with the defendant's age and social background, overwhelmingly demonstrates that transfer is warranted. As the Second Circuit has emphasized, "the goal of rehabilitation must be balanced against 'the threat to society posed by juvenile crime.' " United States v. Nelson , 90 F.3d 636, 640 (2d Cir. 1996) (quoting United States v. J.D. , 525 F.Supp. 101, 103 (S.D.N.Y. 1981) ). The Sixth Circuit has similarly reasoned that "a motion to transfer is properly granted where a *418 court determines that the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation." United States v. T.F.F., A Juvenile Male , 55 F.3d 1118, 1121 (6th Cir. 1995) (quoting United States v. One Juvenile Male , 40 F.3d 841, 844 (6th Cir. 1994) ). Here, with respect to this defendant, the Court concludes that there is no likelihood that the goals of the juvenile system will be achieved while the defendant is in juvenile custody and, under the particular circumstances of this case, "the concerns of public protection and punishment become paramount." Nelson , 90 F.3d at 640. In other words, the juvenile justice system is simply ill-equipped and woefully insufficient, under the circumstances of this case, to adequately address, in the interest of justice, these violent crimes when considered in conjunction with the other statutory factors.
In short, after thoroughly considering and weighing the statutory factors, the Court has determined in its discretion that treating the defendant as an adult in this case will serve the interest of justice.[2]
I. THE CHARGES [3]
The charges against the defendant stem from the government's continuing investigation into the MS-13. (Gov't Mem. 2.) Since approximately 1998, MS-13 members on Long Island have engaged in street wars with rival gangs, which have resulted in the assault and murder of MS-13 and rival gang members, their family members, and innocent bystanders. (Id. at 2-3.) On induction into the MS-13, members agree to kill rival gang members whenever possible. (Id. at 4.)
*419 The defendant, an alleged MS-13 associate, is charged in connection with the murders of four suspected 18th Street Gang members. (Id. at 7.) According to the government, the defendant instigated the murders, participated in planning them, and assisted the MS-13 in carrying them out. (Id. at 6-8.) More specifically, the defendant and a friend ("Juvenile Female 1") allegedly saw pictures of some of the victims flashing MS-13 signs on social media. (Id. at 7.) Knowing that the penalty for this alleged disrespect would be death, the defendant and Juvenile Female 1 showed the pictures to MS-13 members. (Id. ) Thereafter, the defendant and Juvenile Female 1 allegedly met with MS-13 members on multiple occasions to plan the April 11 murders. (Id. )
Pursuant to that plan, on April 11, 2017, the defendant and Juvenile Female 1 invited one of the individuals from the pictures ("Surviving Victim 1") to smoke marijuana in a wooded area near the Central Islip Recreational Center. (Id. ) Surviving Victim 1 accepted the invitation, and invited the four victims to join. (Id. )
Meanwhile, MS-13 members and associates waited in the wooded area and prepared for the murders. (Id. at 7-8.) The government alleges that, while waiting for the defendant and Juvenile Female 1 to bring the victims to their location, these individuals discussed the plan, divided up knives and machetes, and made clubs out of tree limbs. (Id. at 8.) The defendant and Juvenile Female 1 allegedly remained in contact with MS-13 members in the woods, and provided them with intermittent location updates. (Id. )
Shortly after the defendant and Juvenile Female 1 arrived at the predetermined location with Surviving Victim 1 and the four victims, the MS-13 members and associates divided into groups, surrounded Surviving Victim 1 and the four victims, and ordered them to get on the ground. (Id. ) Surviving Victim 1 immediately escaped, but the four victims were hacked and beaten to death with the machetes, knives, and tree limbs. (Id. )
According to the government, the MS-13 members and associates then dragged the victims' bodies a short distance and fled, concerned that Surviving Victim 1 would alert the police to their location. (Id. ) They allegedly planned to bury the bodies the following night. (Id. ) Before they could do so, the Suffolk County Police Department discovered the bodies. (Id. )
The day after the murders, on April 12, 2017, the defendant received a call from her incarcerated boyfriend ("John Doe 1"), an alleged MS-13 member.[4] (Id. at 9.) During that call, which was recorded,[5] the defendant cryptically informed John Doe 1 about her participation in the April 11 murders. (Id. ) She also conveyed the motivation for the murders, stating, "They were 18[th Street]... but they are not here anymore, they are looking at lights." (Id. at 12.) When asked by John Doe 1 whether MS-13 members "forced [her] to do it," the defendant responded, "No, I did it myself. Like I'm telling you, I did it myself. So now is my turn." (Id. at 11.) The defendant also expressed concern that Surviving Victim 1 had escaped, stating: "[T]hey are out of here, you understand?
*420 They are off the map, but one of them, one of them was able to stay on the map. That one that's still on the map is the problem." (Id. at 12.) The defendant also told John Doe 1 that she would lie to investigators if questioned about the April 11 murders. (Id. )
In the weeks after the April 11 murders, the defendant allegedly did lie to investigators and seek to impede the investigation. (Gov't Reply 3.) According to the government, the defendant lied to police about her role in the April 11 murders, and portrayed herself as an innocent victim and witness to the murders whose life was spared for unknown reasons. (Id. ) Moreover, after the police interviewed the defendant, she allegedly alerted the MS-13 members who participated in the April 11 murders, and urged them to flee. (Id. ) Three days after the murders, when police attempted to stop a car in which the defendant was riding with an MS-13 member, the defendant allegedly tried to destroy her cell phone and SIM card, and threw both items from the moving car. (Id. ) Finally, during a second police interview, the defendant allegedly lied again about her role in the April 11 murders. (Id. )
On July 13, 2017, the defendant was arrested in connection with the April 11 murders.[6] (Gov't Mem. 13.)
II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER
"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." United States v. Nelson (Nelson I) , 68 F.3d 583, 588 (2d Cir. 1995) (quoting 18 U.S.C. § 5032 ).[7] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the alleged offenses; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavioral problems. See 18 U.S.C. § 5032 ; Nelson I , 68 F.3d at 588. Given the presumption in favor of juvenile adjudication, the burden is on the government to establish by a preponderance of the evidence that transfer is warranted. See, e.g., Nelson I , 68 F.3d at 588 ; United States v. Doe , 49 F.3d 859, 868 (2d Cir. 1995).
Although the Court must evaluate each factor identified in Section 5032, it need not afford each factor equal weight, and "may balance the factors in any way *421 that seems appropriate to it." Nelson I , 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing th[at] factor more heavily than the other statutory factors." Id. at 590. This is particularly true when the case involves "[t]he heinous nature of the crime of intentional murder." Id.
In weighing the factors, "the district court must keep in mind that 'permeating the transfer decision and the six-factor inquiry is the notion of rehabilitation.' " United States v. Ramirez , 297 F.3d 185, 193 (2d Cir. 2002) (quoting United States v. Nelson (Nelson II), 90 F.3d 636, 640 (2d Cir. 1996) ). Indeed, "[r]ehabilitation clearly is one of the primary purposes of the juvenile delinquency provisions," Nelson II , 90 F.3d at 640 (quoting Nelson I , 68 F.3d at 590 ), and "the statutory factors have been identified primarily because of their impact on the juvenile's rehabilitative potential," id.
Even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," that potential "must be balanced against 'the threat to society posed by juvenile crime.' " Id. (quoting United States v. J.D. , 525 F.Supp. 101, 103 (S.D.N.Y. 1981) ). Accordingly, a "glimmer of hope" for a juvenile's future treatment prospects is insufficient to prevent transfer. Nelson I , 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance" between "affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." Nelson II , 90 F.3d at 640.[8]
III. ANALYSIS OF FACTORS
A. Age and Social Background
1. Age
The Second Circuit has instructed that a district court should consider a juvenile defendant's age both at the time of the alleged offense and at the time of the transfer hearing. See Nelson I , 68 F.3d at 589 (finding that district court correctly considered juvenile's age at the time of the offense, but erred in not also considering juvenile's age at the time of the transfer hearing). As for the juvenile defendant's age at the time of the alleged offense, "a crime committed when the juvenile was 'very young' or that was 'an isolated indiscretion' supports transfer less, whereas conduct that occurs closer to age 18 or over a prolonged period of time supports transfer more." United States v. C.F. , 225 F.Supp.3d 175, 184 (S.D.N.Y. 2016) (quoting Doe , 49 F.3d at 867 ). The juvenile defendant's age at the time of the transfer hearing "is significant for a determination *422 of whether juvenile-type rehabilitation programs would be appropriate," considering the older a juvenile defendant is, "the harder it becomes to reform the juvenile's values and behavior." Nelson I , 68 F.3d at 589. Accordingly, the older a juvenile defendant is both at the time of the alleged offense and at the time of the transfer hearing, the more the juvenile defendant's age weighs in favor of transfer. See, e.g., C.F. , 225 F.Supp.3d at 184 ; United States v. A.O. , No. 15 Cr. 608-10, 2016 WL 4197597, at *5 S.D.N.Y. Aug. 8, 2016 (collecting cases); United States v. Doe , 145 F.Supp.3d 167, 183 (E.D.N.Y. 2015) (collecting cases).
Here, the defendant was approximately seventeen years and four months old at the time of the April 11 murders, and eighteen years and five months old at the time of the transfer hearing. (Gov't Mem. 3.) Accordingly, the defendant's age at the time of the charged conduct and at the time of the hearing both favor transfer. See, e.g., United States v. Sealed Defendant 1 , 563 F. App'x. 91, 92 (2d Cir. 2014) (affirming transfer where, among other things, juvenile defendant "was just three months shy of his eighteenth birthday when he allegedly committed the offense and twenty years old at the time of the transfer hearing"); Doe , 145 F.Supp.3d at 183 (finding the defendant's age "weigh[ed] heavily in favor of transfer" where he was months away from eighteen years old at time of offense and over the age of eighteen at time of transfer hearing); United States v. H.V.T. , No. 96-cr-244 (RSP) (GJD), 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) (juvenile's age favored transfer where he was eighteen years old at the time of the alleged conduct and nineteen years old at the time of the transfer hearing).
2. Social Background
The Court must also consider the defendant's social background to the extent that background is indicative of her potential for rehabilitation if adjudicated as a juvenile. As explained below, under the circumstances of this case, the Court finds that the defendant's social background suggests a low likelihood of successful rehabilitation if the defendant were adjudicated as a juvenile. Accordingly, the Court finds that this factor weighs in favor of transfer.
The parties do not dispute that the defendant's formative years were marked by a "pattern of instability and neglect." (Gov't Reply 2.) The defendant was born in Maine to a single mother[9] who had recently entered the United States illegally to seek work. (Forensic Psychological Evaluation by Dr. Virginia Barber Rioja ("Rioja Rep.") 2.) When the defendant was nine months old, her mother sent her to live with her grandparents in Honduras. (Id. ) From then until she was nine years old, the defendant was passed between her mother, other relatives, and her mother's friends and acquaintances in Honduras and Mexico. (Id. at 2-3.) These individuals, including her own mother, neglected and abused the defendant throughout her early childhood. (Id. )
At age nine, the defendant moved to Maine to live with her aunt ("the Maine Aunt"). (Id. at 3.) The defendant regularly attended school, where she reportedly earned above-average grades. (Id. ) At the same time, the defendant reported that the Maine Aunt neglected her and that, as a *423 result, she felt lonely and depressed during her time in Maine. (Id. at 3-4.)
According to Child Protective Services ("CPS") records submitted by defense counsel, when the defendant was thirteen, she became sexually involved with a nineteen year old male ("John Doe 2"). The defendant met John Doe 2 sometime in 2013 while visiting an aunt in Central Islip ("the New York Aunt").[10] In December 2013, the defendant went to Central Islip for Christmas, and refused to return to Maine. After the Maine Aunt sought help from a social worker at the defendant's school, CPS opened an investigation into the New York Aunt. The investigation revealed that the New York Aunt knew that the defendant had an ongoing sexual relationship with a nineteen year old male, and that the New York Aunt condoned the relationship. Accordingly, CPS found that the New York Aunt had allowed sexual offenses to be committed against the defendant and returned the defendant to the Maine Aunt's custody. Nevertheless, after the defendant completed middle school in Maine, she moved back to Central Islip to be near John Doe 2. (Rioja Rep. 4.) She initially lived with the New York Aunt, but their relationship was strained. (Id. ) As a result, the defendant moved in with John Doe 2 at his mother's house. (Id. ) The defendant reported that John Doe 2 was both unfaithful and abusive during their relationship. (Id. ; Albarus Rep. 10-11.)
When she was fifteen, the defendant's relationship with John Doe 2 ended. (Rioja Rep. 4.) She stayed intermittently with the New York Aunt and with one of the New York Aunt's friends.[11] (Id. ) Both individuals required the defendant to pay rent. (Id. ) To do so, the defendant worked in bars where she earned commissions based on the number of drinks she sold. (Id. ) The defendant reported that she drank heavily while at work. (Id. ) During this time, the defendant was enrolled at Central Islip High School, but was frequently absent and ultimately did not complete the ninth grade. (Id. at 5.)
The defendant met John Doe 1, an alleged MS-13 member, while she was at work. (Id. ) The defendant reported that she was drawn to John Doe 1 because they had both been abandoned by their families. (Id. ) She further reported that John Doe 1 is the only person she has ever truly loved and that he is the first person to truly care for her. (Id. ) John Doe 1 was arrested in connection with alleged MS-13 activities shortly before the April 11 murders. (See id. )
Currently, the defendant is enrolled at Sojourn High School in Essex County Juvenile Detention Center ("ECJDC"). (See Def. Mem. Ex. C.) Her grades are above-average, and her educational plan is to complete the ninth and tenth grades so that she can take New York State Regents exams and earn a high school diploma. (See id. ) Her teachers and advocates at ECJDC report that her behavior has been exemplary. (Rioja Rep. 5-6.) At the same time, the defendant remains in a romantic relationship with John Doe 1, and the two frequently communicate. (Gov't Reply 3-4.)[12]
*424 The Court finds that the defendant's social background, taken in its entirety, suggests a low likelihood of rehabilitation within the short period of time before her release if convicted as a juvenile.[13] Dr. Rioja concluded that the defendant became involved with the MS-13 and John Doe 1 because of her "history of maltreatment and abuse," "lack of strong family or social supports," and "most importantly, peer delinquency." (Rioja Rep. 13; see also id. at 10-12.) According to Dr. Rioja, these influences are also the defendant's primary risk factors for future violence and recidivism. (Id. at 13.) Unfortunately, it is unlikely that any of these influences would disappear from the defendant's life in the short time before she would be released if adjudicated as a juvenile. The defendant does not know her father. (Albarus Rep. 4.) Her mother currently lives in Mexico, and last spoke with the defendant in 2013. (Rioja Rep. 8.) When interviewed in connection with the instant motion, the New York Aunt told Dr. Rioja that she does not consider the defendant to be her family, and that she is currently "focused on [her] own children and [her] mother." (Id. ) The Maine Aunt admitted to the mitigation specialist that she was not an affectionate caregiver and that she had invited the defendant to live with her at age nine because she hoped to receive public assistance (as the defendant is a United States citizen). (Albarus Rep. 9.) Although the Maine Aunt also reported to Dr. Rioja that the defendant was "never an offensive or disrespectful person or treated me poorly in any way," (Rioja Rep. 7), there is no evidence that she would be willing to take responsibility for the defendant on her release. Though regrettable, there is also no evidence of any other person who would be willing and able to provide stability and structure for the defendant on her release. Thus, the defendant would likely return to the same unstable and unsupportive environment that led to her participation in the April 11 murders.
This utter lack of a positive support structure is particularly concerning because, since the April 11 murders, the defendant has continued to identify and associate with the MS-13. The day after the April 11 murders, the defendant made clear to John Doe 1 that she willingly participated in the murders and viewed that participation as her "turn." She expressed no remorse or shock over her involvement in four brutal deaths. Instead, her main concern was that Surviving Victim 1 could identify her and knew where she lived. When given the opportunity to cooperate with the investigation, the defendant chose instead to lie to investigators, warn other MS-13 members and associates, and attempt to destroy evidence. What is more, rather than end her relationship with John Doe 1, an alleged MS-13 member, the defendant remains in frequent communication with him. Indeed, she describes him as the only person she has ever truly loved and the only person to have ever truly cared for her.
The Court notes that Dr. Virginia Barber Rioja, a psychologist who examined the defendant and submitted a report in connection with the instant motion, opined that the defendant's high achievement and good behavior at ECJDC "make her a *425 good candidate for treatment and rehabilitation." (Rioja Rep. 13.) The Court, however, finds that conclusion unpersuasive in the context of the entire record for several reasons.
First, in reaching this conclusion, Dr. Rioja did not consider the defendant's alleged involvement in the April 11 murders, or her alleged obstruction of justice after the murders. In particular, Dr. Rioja acknowledged that "[t]he assessment of dangerousness risk in this case is significantly limited by the fact that [the defendant] denied the allegations, and it is not possible for this writer to accurately ascertain her actual level of involvement in the MS-13 or the crimes that she is being accused of." (Id. at 10 (emphasis added).) In the "Summary and Opinions" section of her report, Dr. Rioja similarly stated, "The fact that [the defendant] denied the allegations against her, which are the only indications of criminal involvement, significantly limits any opinions with regards to her level of risk for future violence or recidivism." (Id. at 13 (emphasis added).)
Second, in finding that the defendant "does not have most of the risk factors identified by the literature as being important predictors of future violence and recidivism," Dr. Rioja acknowledged that the assessment of risk for dangerousness does consider characteristics such as "premeditation," "lack of remorse," and "general disregard for others." (Id. at 11.) Dr. Rioja made passing reference to these risks in her report (for example, "it is alleged that she was connected to the MS-13 (delinquent peer group) and that she engaged in racketeering (a premeditated crime)" (id. ) ), without any recognition that (1) the MS-13 is more than just a "delinquent peer group," but rather a ruthless and violent street gang; (2) the defendant's alleged involvement was not just in "racketeering," but rather in actively participating in the planning and murder of four individuals; or (3) the defendant allegedly showed no remorse following the murders, but rather attempted to obstruct justice following the murders by lying about what had occurred and destroying evidence.
Third, as noted, Dr. Rioja identified some of the defendant's main risk factors for future violence or recidivism to be "a lack of strong family or social supports" and "peer delinquency," and stated that "[h]er risk for reoffending appears to be closely linked to her alleged involvement with a member of the MS-13, which in turn, is linked to her emotional vulnerabilities." (Id. at 13.) Although Dr. Rioja believes that certain interventions will "likely assist with gang disengagement and significantly decrease her level of recidivism risk" (id. ), that conclusion does not consider the level of the defendant's allegiance to the MS-13 (including the recorded conversation with her boyfriend, an alleged MS-13 member, following the murders) or the fact that the defendant is likely to have little, if any, family or social support upon her release from juvenile custody.
In short, given that Dr. Rioja's assessment of the defendant's risk for future violence or recidivism is "significantly limited" and fails to adequately take into account the allegations of her active involvement in the April 11 murders and obstruction of justice following those murders, the Court finds the conclusions to be of limited value in the overall balancing of factors. Although the defendant's current success at Sojourn High School and exemplary behavior at ECJDC are certainly positive, the Court finds that those mitigating factors are outweighed by the other strong indications that successful rehabilitation is unlikely if the defendant is adjudicated as a juvenile. Accordingly, the Court finds that the defendant's lack of a support *426 structure, in the context of her alleged violent criminal acts and alleged ongoing association with the MS-13, weighs in favor of transfer. See, e.g., Doe , 49 F.3d at 867 (affirming district court's conclusion that social background weighed in favor of transfer where, among other things, defendant's mother lived in Vietnam, his father had petitioned a family court for judicial supervision of defendant, and "by the time of the offenses charged ... [defendant] was completely estranged from his father, preferring the violent BTK gang over his biological family"); A.O. , 2016 WL 4197597, at *6 (finding social background weighed in favor of transfer where juvenile defendant "was subject to abuse, neglect, and episodes of abandonment" and "ha[d] experienced other disturbing or traumatic episodes in his life"); United States v. C.P.A. , 572 F.Supp.2d 1122, 1126-27 (D.N.D. 2008) (finding social background weighed in favor of transfer where juvenile defendant came from "an extremely dysfunctional and unstable family" because likelihood of rehabilitation if returned to that environment was "slim"); H.V.T. , 1997 WL 610767, at *4 ("[T]he defense's expert psychologist[ ] testified that H.V.T.'s separation from his mother at a young age, his lack of role models or attachment figures, and his older brother's death left H.V.T. highly vulnerable to being misdirected by others.... It appears that H.V.T. had a family structure available to him in his older brothers and aunts and uncles in the United States. Instead of taking advantage of the support that structure offered, H.V.T. quit school and left home .... It also appears that H.V.T. became a member of a gang. He wears a tattoo containing a dragon and the letters [of his gang].... H.V.T. has been for some time completely estranged from his aunt in Florida who took him in following his prior conviction, and his brother indicates that he has had no contact with H.V.T. and would be unable to take care of him. I find that H.V.T.'s social background favors transfer.").[14]
B. Nature of the Alleged Offense
As an initial matter, the Court notes that, in considering this factor, the Court must assume that the juvenile defendant committed the offenses charged and abstain from examining the strength of the government's evidence. See, e.g., United States v. Sealed Defendant , 714 Fed.Appx. 65, 67 (2d Cir. 2018) ("[T]he district court correctly assumed, for purposes of the transfer hearing, that the government's allegations against B.M. are true."); Nelson I , 68 F.3d at 589 ("We think that it is the better practice for the district court simply to assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information."). Additionally, as explained above, the Court may weigh this factor more heavily than any other when the alleged offense is particularly serious.
*427 See, e.g., Ramirez , 297 F.3d at 193 (quoting Nelson I , 68 F.3d at 590 ).
Here, the seriousness of the alleged offenses cannot be overstated. The defendant is charged with four premeditated and brutal murders carried out for the MS-13. The government alleges that she instigated the murders by showing pictures of some of the victims flashing MS-13 signs to MS-13 members, knowing that their punishments would be violent deaths. The defendant then allegedly aided the MS-13 in murdering the victims by luring them to a prearranged location in the woods. As a result of the defendant's alleged conduct, four people were brutally hacked and beaten to death with knives, machetes, and tree limbs.
The defendant is further charged with conspiring to obstruct the resulting investigation. She allegedly lied to investigators, tried to destroy evidence relating to the April 11 murders, and warned MS-13 members about the investigation and encouraged them to flee.
Given the obvious severity of the alleged crimes, the Court finds that this factor weighs strongly in favor of transfer, and gives this factor more weight than any other.[15] Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious as-or even less serious than-the crimes alleged here. See e.g., United States v. Wilson , 149 F.3d 610, 614 (7th Cir. 1998) (district court was "within its discretion to give more weight to the nature of the alleged offense than to the other factors" where defendant was charged with distributing cocaine and crack and had allegedly "brandished a gun and expressed a willingness to use it" in the course of that distribution); United States v. One Juvenile Male , 40 F.3d 841, 845-46 (6th Cir. 1994) (district court did not abuse its discretion in concluding that heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a passenger, "outweighed any factors that supported trying the defendant as a juvenile"); United States v. A.R. , 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); United States v. Hemmer , 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); A.O. , 2016 WL 4197597, at *7 (nature of alleged offense was most important factor and weighed in favor of transfer where juvenile defendant was charged with the intentional shooting of two people, the reckless shooting of several others, and the conscious decision to carry a firearm in connection with racketeering and narcotics-trafficking offenses); United States v. Doe # 1 , 74 F.Supp.2d 310, 321 (S.D.N.Y. 1999) (although majority of factors weighed against transfer, transfer was warranted where the "defendant [was] charged with a host of serious crimes, including murder and *428 other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior").
C. Nature and Extent of Any Prior Delinquency Record[16]
The government states that it is "not aware of any prior criminal history for this defendant" (Gov't Mem. 25), and defense counsel represents that the defendant "has no prior criminal record or record of juvenile delinquency," (Def. Mem. 22). Accordingly, the Court finds that this factor weighs against transfer. However, the Court notes that the absence of a prior delinquency record does not preclude the transfer of a defendant to adult status when, as in this case, a balancing of all the statutory factors weighs in favor of transfer. See, e.g., United States v. Sealed Appellant 1 , 591 F.3d 812, 822 (5th Cir. 2009) (affirming district court's decision to transfer juvenile to adult status despite lack of a prior juvenile record); United States v. Juvenile Male , 554 F.3d 456, 468-70 (4th Cir. 2009) (finding that district court did not err in granting government's transfer motion where the defendant had no prior criminal record and the only factors favoring transfer were the nature of the offense and the defendant's age and social background).
D. Present Intellectual Development and Psychological Maturity
Generally, a juvenile defendant's "present intellectual development and psychological maturity support transfer where the juvenile is closer to average levels of intelligence and emotional or psychological maturity for the juvenile's age." A.O. , 2016 WL 4197597, at *7 (citing United States v. Juvenile Male , 844 F.Supp.2d 333, 345-46 (E.D.N.Y. 2012) ); see also United States v. A.A.D. , 106 F.Supp.3d 272, 277 (D.P.R. 2015) (citing J.D. , 525 F.Supp. at 103-04 ) ("Transfer to adult status is less favored for juveniles who exhibit low intellectual development and stunted psychological maturity because they are viewed as less responsible for their conduct."). As noted above, Dr. Rioja conducted a psychological examination of the defendant and detailed her findings in a written report. During the examination, Dr. Rioja administered cognitive and psychological tests, including the Reynolds Intellectual Screening Test ("RIST") and the Risk Sophistication Treatment Inventory.
With respect to intellectual development, Dr. Rioja concluded that the defendant "functions at least within the average range of intellectual or cognitive functioning." (Rioja Rep. 10.) She found that the defendant demonstrated "no deficits in cognitive maturity," and that, "in fact [the defendant] can be intellectually resourceful." (Id. at 13.) Dr. Rioja further reported that the defendant's RIST score "places her in the average range" of general intelligence. (Id. at 9.)
As to the defendant's psychological maturity, Dr. Rioja did not observe any evidence of psychopathology, severe personality disorder traits, or significant impulsivity problems. (Id. at 13.) She further noted that the defendant has "adequate interpersonal skills," and is "able, to a certain extent, to delay gratification when needed to obtain a goal." (Id. at 10.) At the same time, Dr. Rioja *429 found that the defendant's "history of abandonment, neglect and abuse interfered with the full development of emotional autonomy and self-concept, and made her emotionally reliant on others, emotionally [and] developmentally immature, and particularly vulnerable to the influences of anyone who would show her love, care, affection, and protection." (Id. at 13.) Dr. Rioja concluded that the defendant's "main delay in development" is in autonomy, which refers to a person's "ability to resist pressures from others, to have clarity in self-concept, to have high self-esteem, or to be aware of strengths and weaknesses." (Id. at 10.) Overall, Dr. Rioja concluded that "despite intact cognitive [and] intellectual skills, [the defendant] has significant delays in developmental maturity." (Id. )
The government argues that the defendant's intellectual functioning is also demonstrated by her active role in the murders, as well as her alleged involvement in obstructing justice in the following ways after the murder: (1) lying to the Suffolk County Police Department during an initial interview and claiming that she too was a "victim" of the attackers whose life was inexplicably spared; (2) after the initial interview, warning MS-13 members who were involved in the murders and urging them to flee; (3) attempting to destroy her cell phone and its SIM card during an attempted vehicle stop by the Suffolk County Police Department on April 14, 2017; and (4) after the vehicle stop, lying again to investigators during an interview about her role in the murders. (Gov't Reply 3.) Given these allegations, the government asserts that "th[is] conduct shows that the defendant is an intelligent and a strategic thinker, albeit for criminal purposes, and that she had no remorse for her actions, but instead, sought to do everything in her power so that she and her MS-13 co-conspirators would not be caught." (Id. )
The Court finds that, on balance, this factor is neutral. The Court accepts Dr. Rioja's finding that the defendant is psychologically immature, which weighs against transfer. However, even putting aside the allegations regarding the obstruction of justice, the defendant's cognitive abilities are clear from Dr. Rioja's report and from the defendant's academic records. Put simply, despite any emotional immaturity, the defendant has the cognitive ability to conform her conduct to the law. See, e.g., United States v. A.R. , 203 F.3d 955, 962 (6th Cir. 2000) ("[C]ourts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law." (citing One Juvenile Male , 40 F.3d at 845 ) ). Accordingly, the Court finds that this factor is neutral.
E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts
There is no evidence that, prior to her detention in connection with the April 11 murders, the defendant ever received any treatment or counseling.
Defense counsel argues that the defendant's educational program at ECJDC constitutes "treatment" under this factor, and that her positive performance in that program demonstrates that this factor disfavors transfer. (Def. Mem. 28.) As noted above, the defendant's teachers and advocates at ECJDC have commended her strong academic performance and exemplary behavior since she was detained approximately eleven months ago. (Rioja Rep. 5-6.) However, for the reasons explained above, the Court finds that the defendant's performance at ECJDC, alone, does not establish that the defendant is *430 likely to be rehabilitated if treated as a juvenile. Even so, given that this factor is specifically aimed at the juvenile defendant's response to treatment efforts and that the defendant has thus far responded well to her program at ECJDC, the Court finds that this factor weighs slightly against transfer. See C.F. , 225 F.Supp.3d at 197 (finding this factor weighed strongly against transfer where, among other things, the juvenile "ha[d] not incurred any disciplinary infractions at Sojourn since his juvenile detention ha[d] begun" and had "been commended for peaceful behavior, joined the facility's church group, and responded well to the juvenile setting"); Doe # 1 , 74 F.Supp.2d at 320 (juvenile's "positive response to the educational and vocational training programs available at Green Correctional Facility" weighed against transfer).
F. Available Programs Designed to Treat the Juvenile's Behavioral Problems
Under this factor, the government bears the burden of establishing a lack of available programs designed to treat the juvenile's behavioral problems. See, e.g., Nelson I , 68 F.3d at 591. With respect to whether programs would be available to the defendant here if convicted as a juvenile, the government asserts that there are no federal facilities for individuals adjudicated as juveniles. (Gov't Mem. 29.) Instead, adjudicated juvenile delinquents from this district are sent to state contract facilities for juveniles. (Id. ) According to the government, there are no contract facilities in New York that would be available to someone the defendant's age. (Id. ) The government does provide, however, that state contract facilities in Pennsylvania and Maine would potentially be available to the defendant. (Id. )[17] The government does not provide any information about treatment programs that would be available to the defendant if adjudicated as an adult.
As noted by the Second Circuit, "[f]or the government to carry its burden of persuasion [on this factor,] it must, of course, do more than merely assert the unavailability of an appropriate program." Nelson I , 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." Id. In this case, there is some indication that state juvenile facilities in Pennsylvania and Maine might be available to the defendant.[18] Accordingly, the Court finds that the government has not met its burden on this factor and that this factor weighs slightly against transfer. See United States v. Doe # 3 , 113 F.Supp.2d 604, 609 (S.D.N.Y. 2000) (finding factor weighed against transfer where "the government did no more than 'merely assert the unavailability of an appropriate juvenile rehabilitative program' for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist" (citing Nelson I , 68 F.3d at 591 ) ).[19]
* * *
In sum, after carefully balancing all the statutory factors based upon the *431 record as set forth herein, the Court concludes that transfer of the defendant to adult status is warranted in this case in the interest of justice. The defendant is charged with four murders in connection with her alleged participation in the violent activity of the MS-13 street gang. These are precisely the types of serious, violent crimes that weigh strongly in favor of transfer. In addition to the gravity of the alleged crimes, other factors-including, inter alia , the defendant's age at the time of the murders, her alleged conduct after the murders, her ongoing communication with an alleged MS-13 member even while incarcerated, and her strong intellectual functioning-collectively demonstrate that the defendant is not likely to rehabilitate within the juvenile system if she is convicted of the charged crimes as a juvenile and provided with juvenile rehabilitation programs. Furthermore, as discussed above, the fact that the defendant is over eighteen years old, considered in conjunction with the other factors, strongly suggests that she is not likely to respond to juvenile-type rehabilitation programs. See Nelson I , 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, 'the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior.' " (citations omitted) ); In re J. Anthony G. , 690 F.Supp. 760, 766 (S.D. Ind. 1988) ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). Accordingly, notwithstanding that some factors favor a denial of the transfer motion, the Court finds that the defendant's rehabilitation potential within the juvenile justice system is low after balancing all the statutory factors.
As noted above, the Second Circuit has made clear that "the goal of rehabilitation must be balanced against 'the threat to society posed by juvenile crime.' " Nelson II , 90 F.3d at 640 (quoting J.D. , 525 F.Supp. at 103 ). Accordingly, given that the crimes charged here are extremely violent and the threat to society posed by these crimes is at the highest level, and given that the overall record demonstrates that the defendant is unlikely to be rehabilitated in the juvenile system, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer the defendant to adult status is granted.
IV. CONCLUSION
For the reasons explained above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.
SO ORDERED.

Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. See 18 U.S.C. § 5038(e). In order to comply with this provision and Section 5038's other provisions requiring the confidentiality of juvenile records, the Court determined that these proceedings and all related documents should be sealed.

This decision is consistent with others in which this Court transferred juveniles to adult status for their alleged participation in violent acts for the MS-13. See generally, e.g., United States v. Juvenile Male , 269 F.Supp.3d 29 (E.D.N.Y. 2017) (defendant was sixteen years, six months old at time of alleged attempted murder of a rival gang member, and sixteen years, eleven months old at time of alleged murder of an MS-13 member suspected of cooperating with law enforcement); United States v. Juvenile Male , No. 14-CR-645 (JFB), 2015 WL 6550344 (E.D.N.Y. Oct. 23, 2015) (defendant was seventeen years, ten months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); United States v. Juvenile Male , No. 11-CR-717 (JFB), 2013 WL 461220 (E.D.N.Y. Jan. 30, 2013) (defendant was sixteen years, seven months old at time of alleged attempted murder of a sixteen-year-old male, and seventeen years, eight months old at time of alleged murder of another individual); United States v. Juvenile Male , No. 12-CR-317 (JFB), 2012 WL 6043271 (E.D.N.Y. Dec. 3, 2012) (defendant was seventeen years, four months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); United States v. Juvenile Male , 844 F.Supp.2d 333 (E.D.N.Y. 2012) (defendant was sixteen years, three months old at time of alleged murder of a fifteen-year-old); United States v. Juvenile Male No. 2 , 761 F.Supp.2d 27 (E.D.N.Y. 2011) (defendant was sixteen years, eight months old at time of alleged premeditated murder of nineteen-year-old woman and her two-year-old son); United States v. Juvenile Male , 844 F.Supp.2d 312 (E.D.N.Y. 2011) (defendant was seventeen years, six months old at time of two alleged attempted murders); United States v. Juvenile Male , 754 F.Supp.2d 569 (E.D.N.Y. 2010) (defendant was seventeen years, eight months old at time of alleged premeditated murder of nineteen-year-old woman and her two-year-old son).

The allegations set forth herein are drawn from the government's motion papers. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." United States v. Nelson , 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offenses as they are alleged by the government and takes no position as to the strength of the evidence supporting those allegations.

At the time of the call, John Doe 1 was incarcerated at the Suffolk County Correctional Facility on a local charge. (Gov't Mem. 9.) He was later indicted in federal court in the Eastern District of New York on various charges relating to alleged MS-13 activities, including racketeering, racketeering conspiracy, conspiracy to murder rival gang members, and conspiracy to distribute narcotics. (Id. at 9 n. 2.)

A transcript of the call was provided to the Court.

Other alleged MS-13 members and associates have been indicted or charged in sealed juvenile informations in connection with the April 11 murders in federal court in the Eastern District of New York. (Gov't Mem. 9.)

In addition, Section 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that ... the offense charged is a crime of violence that is a felony ... and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted the required certification from the then-acting United States Attorney for the Eastern District of New York, acting pursuant to the authority delegated to her by the Attorney General.

Section 5032 also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of physical force, or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and (3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer. See 18 U.S.C. § 5032 ; United States v. Juvenile Male # 1 , 47 F.3d 68, 69 (2d Cir. 1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard.

The defendant's father visited her once when she was three months old. (Mitigation Report by Carmeta Albarus of CVA Consulting Services, Inc. ("Albarus Rep.") 4.) The defendant has had no additional contact with her father. (See id. )

The parties' submissions state that the defendant met John Doe 2 for the first time while she was in Central Islip for Christmas in December 2013; however, CPS records indicate that the relationship began approximately seven months before the defendant traveled to Central Islip for Christmas.

Although the record is unclear, there is some indication that the defendant was briefly homeless. (See Albarus Rep. 11.)

At the May 18, 2018 hearing, defense counsel acknowledged that the defendant remains in communication with John Doe 1.

The government asserts that, according to the Bureau of Prisons, the defendant would be transferred to an adult facility when she turned twenty-one even if she were convicted as a juvenile. (Gov't Mem. 29.) Defense counsel asserts that the defendant could remain in a juvenile detention facility for the duration of her sentence, which would be limited to five years' imprisonment. (Def. Mem. 10.) Even assuming that the defendant could remain in a juvenile detention facility for the five-year statutory maximum, the Court finds that it is unlikely that the defendant would successfully rehabilitate in that time.

The Court acknowledges that some courts have found that a juvenile defendant's unstable or abusive family life weighed against transfer. See, e.g., United States v. Doe # 1 , 74 F.Supp.2d 310, 320 (S.D.N.Y. 1999). Although an unstable or abusive family life could certainly be viewed as a particularly strong factor weighing against transfer under some circumstances, that is not the case here where, among other things, (1) the defendant's background cannot adequately explain her decision to become involved in alleged violent crimes of this gravity and brutality, (2) there is no indication that the defendant will have a social structure in place to stabilize her life upon release from a juvenile facility, and (3) the defendant is alleged to have shown continuing allegiance to the MS-13 following her alleged active participation in four murders, and it is conceded that she continues to communicate with an alleged MS-13 member even while incarcerated at a juvenile facility.

Defense counsel concedes that "this factor weighs in favor of transfer, given the inarguable seriousness of the charged offenses." (Def. Mem. 21.)

There is a circuit split as to whether this factor is limited to convictions, or encompasses unadjudicated conduct like prior arrests. Compare United States v. Wilson , 149 F.3d 610, 613 (7th Cir. 1998), with United States v. Juvenile LWO , 160 F.3d 1179, 1183 (8th Cir. 1998). The Second Circuit has not directly addressed the issue, and this Court need not resolve this question here because there is no indication that the defendant was arrested before her arrest in connection with the April 11 murders.

Accordingly, the government concedes that this factor "may weigh slightly against transfer." (Gov't Mem. 29.)

Defense counsel also asserts that there is a juvenile facility in Washington, D.C. (Def. Mem. 31 n. 3.)

Although the Court finds that this factor and the previous factor weigh slightly against transfer, the Court also finds that these factors do not warrant maintaining the defendant's juvenile status because the overall balancing of the statutory factors overwhelmingly favors transfer.